Filed 4/11/23 J.R. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| J.R., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF ALAMEDA COUNTY, <br><br> Respondent; <br><br> ALAMEDA COUNTY SOCIAL SERVICES AGENCY, et al. <br><br> Real Parties in Interest. | A167039 <br><br> (Alameda County Super. Ct. Nos. JD033286-01; JD033287-01; JD033288-01; JD033289-01) |

J.R. (Father) petitions this court for extraordinary relief from dependency court orders terminating reunification services after an 18-month review and setting a hearing under Welfare and Institutions Code section 366.26 to select permanent plans for his children J.R., E.R., G.R., and Z.R. (Minors). Father argues that because his case plan did not include services related to domestic violence, the juvenile court erred in finding by clear and convincing evidence that reasonable services were provided or offered to him. Father also argues that in the absence of reasonable services, the juvenile court erred in declining to extend the reunification period and offer continued services.

1

The family in this case came to the attention of the Alameda County Social Services Agency (Agency) after an incident involving domestic violence. Although Father had apparently been involved in multiple domestic violence incidents, including as a victim, domestic violence services were never part of Father's case plan. Father asked the Agency about domestic violence services a few months after the case began, and was given a referral, but the only follow-up reflected in the record is that shortly after the referral, the Agency learned that Father had not completed the registration paperwork.

Despite a rocky start, Father had made progress by the time of the 18-month hearing. Father was in regular contact with Minors, his visits were going well, and he had progressed to unsupervised visitation. He had a suitable home for Minors, then ages 8 through 15, and was arranging school and childcare for them. The Agency was at the point of recommending family maintenance services. Then, as Father was furnishing his home so it would be ready for the children if they were returned to him, he was involved in an incident where his former girlfriend, who was in his home despite the fact that he had a protective order against her, threw a pot of hot water at him. For fear of losing his children, Father was not truthful about the incident with the Agency.

The Agency asked the juvenile court to terminate services, and Father requested immediate return of Minors or an extension of services. Although Minors' counsel was in favor of extending services, and although the juvenile court observed that domestic violence services should have been part of the case plan, the juvenile court terminated reunification services.

In the circumstances here, the termination of services was error, and therefore we grant Father's petition.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Initial Petition and Detention – March through May 2021*

On March 5, 2021, the Agency filed a petition alleging that Minors came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivision (b)(1), on the grounds that their mother, N.R. (Mother), and Father failed to protect them.[1]  The agency alleged that Mother and Father were "unable or unwilling to address critical areas of food, medical and/or mental health care, and the educational needs of [M]inors," and that Minors had "been exposed to ongoing domestic violence between the parents" and were in danger of being seriously harmed.  Minors had not been detained.

The Agency alleged that Minors were "frequently exposed to domestic violence," having been in the home during altercations between Mother and Father.  A domestic violence criminal protective order had been issued against Father in April 2020 preventing him from contacting Mother and Minors until April 2023.  In January 2021 Mother and Father were both arrested, Mother for robbery and domestic violence (she brandished a knife and demanded Father's earrings in the presence of two of the Minors) and Father for violating the restraining order.  The Agency further alleged that Minors J.R. and E.R. were not enrolled in school; and that Minors reported being hungry with little or no food available to them.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.  The superior court case numbers ending in 286, 287, 288, and 289 pertain to Minors J.R., E.R., G.R, and Z.R., respectively.  When the petition was filed, Minor J.R. was 13 years old, E.R. was 11, G.R. was 9, and Z.R. was 6.  Mother is not a party to the writ petition, and we discuss facts concerning her only insofar as they are relevant to the issues before us.

In a report filed in advance of the initial hearing, the Agency reported that Mother and Father were married but living separately. Despite the existing restraining order, Father had been living in Mother's home since December 2020. For some months before that, Minors J.R. and E.R. lived with Father and his girlfriend A. in Gilroy, but after Father and A. separated, Father brought J.R. and E.R. back to Mother's home and Father had asked to stay. He had been sleeping on the sofa.

Minor J.R. reported that he is used to Mother and Father "fighting a lot"; Mother and Father pushed and shoved each other; he had not seen Father hit Mother, but Mother had slapped Father. J.R. also reported that Father fought with the girlfriend in Gilroy, but they just yelled at each other. Minors' older half-brother (Brother), age 20, a college student who lived in Southern California with his partner, reported that Mother and Father had been trying to get divorced for six years, fought two or three times a month, and had fights like the one that occurred in January 2021 about once every five or six months.

In advance of a scheduled jurisdiction hearing, the Agency filed a report recommending that the allegations of the petition be found true and requesting a continuance to assess the family's circumstances for disposition. At the time of the report, Minors were living with Mother. The court continued the hearing.

The Agency then filed a disposition report recommending that the petition be found true and that Minors remain in the care of Mother with family maintenance services. With respect to plans for placement, the report referred to consideration of placement with Father or relatives, and identified Brother as a possible placement. The report noted that if the restraining order against Father was modified, Father would have visitation with

4

Minors, stated that Mother had recently told an investigator to drop the restraining order, and further stated that the Agency was worried about Mother dropping the restraining order "when the domestic violence concerns between [the parents] have not been mitigated." Yet the Agency's proposed case plan did not include any domestic violence component for either parent, and contained just one service objective for Father, which was to make sure Minors attend school on a regular basis.

The hearing was further continued after the Agency asked for time "to further assess the safety of [M]inors in the home" in view of new concerns about Mother's use of drugs. The court ordered the Agency to develop a safety plan for Minors, and ordered the Agency to detain Minors if the safety plan was unsuccessful.

The Agency was unable to create a safety plan, and on May 25, filed an amended petition. By that time, Minors had been detained and were living with Brother, who had expressed willingness to be a placement option if needed.

B.    *Detention Hearing, Jurisdiction, and Disposition – May through August 2021*

In its detention report, the Agency stated that Father had expressed his desire to obtain custody of Minors and informed the Agency that he was willing to engage in services to obtain new behaviors and eliminate the Agency's concerns. He specifically asked to be referred to domestic violence classes.

At a hearing on May 26, 2021, the juvenile court ordered Minors detained. The court ordered that reunification services be provided as soon as possible, and ordered supervised virtual visitation between Minors and their parents.

5

On June 11, 2021, the Agency filed a jurisdiction/disposition report recommending that the allegations in the amended petition be found true; that Minors remain in out-of-home care; and that Mother and Father receive reunification services. As it had in its earlier reports, in discussing past harm the Agency mentioned reports that Minors "were frequently exposed to domestic violence and . . . have been in the home during these altercations." And in discussing future risk, the Agency stated that Minors were at risk of emotional and physical harm from incidents of domestic violence. The Agency's proposed case plan for Father was similar to its previous proposed case plan: once again, the sole service objective for Father was to make sure Minors attend school on a regular basis. A contested hearing was scheduled for August 13, 2021.

In an addendum report filed on July 7, 2021, the Agency reported that text messages and voicemails had been exchanged with Father, but no conversation had taken place. Brother, who was caring for Minors, reported that video visits were "problematic" because Father was making derogatory comments about Brother and his partner. Brother also reported that Father, who had recently relocated, was telling Minors that they would be coming to live with him and that he and Mother were trying to work things out.

In a further addendum report filed on August 11, 2021, the Agency reported continued difficulties in contacting Father, who was not responding to voicemails requesting calls back. The Agency also reported that at some (unspecified) point the Agency had referred Father to Peace Creations, a domestic violence counseling provider in Alameda County, but as of July 20, father had not completed the registration paperwork to begin classes. On July 22, Brother reported that Father's girlfriend, A., had told Brother that Minors should not be returned to Father's care, that she was going to be

6

filing charges for domestic violence against Father, and that Father might be using drugs.  On July 23, the social worker met with Father, who reported he had space for Minors at his current home in Oakland and was willing to do whatever services and classes were needed.  He also stated that he has PTSD from being stabbed several times, including in his chest.[2]  That same day, the social worker supervised a video visit between Father and Minors.  The social worker reported that Father had thoughtful things to say to all the Minors, and intervened when they were fighting.  He told Minors he had extra room for them to return home.  When the social worker prompted him to remind Minors that he had some things to work on before Minors could come home, Father said he was doing all the classes he needed to do to so they could return home.  Minors asked Father if he still lived with A., and Father said he did.  By the time the addendum report was filed, Father had two additional supervised visits with Minors by video call, and one supervised in-person visit.

According to the report, Mother informed the social worker that in early August, Father's girlfriend A. came to her residence.  Mother and A. went out together, and at some point A. let Mother use her car, but later Mother was beaten up at a store by Father and A.  She told the Agency she suffered a black eye and bruises and had filed a police report about the incident.  Father told the Agency that Mother was contacting him by email about an incident that had occurred in which Mother stole A.'s car – he said he did not know why Mother and A. were "hanging out," but that A. had been upset that he was not at home.  Also in August, Father stated that his symptoms from PTSD and depression had come back, and he was taking

_____

[2] At a review hearing in 2023, Father testified that Mother had stabbed him.

medication to manage them. Father also told the Agency that he was looking into quashing the protective order against him so he could see Minors; and the Agency again expressed worry about the restraining order being dropped "when the domestic violence concerns between [Mother and Father] have not been mitigated."

At the August 13, 2021 hearing, the court found the amended petition true, ordered reunification services and adopted the case plan. A review hearing was set for February 2, 2022.

C. *Six-Month Review – August 2021 through March 2022*

In advance of the scheduled review hearing, the Agency filed a report recommending that Minors remain in out-of-home care, with termination of services to Mother and continued services to Father. Although Father had not been in regular communication with the Agency, at the beginning of the reporting period Father attended regular video visits with Minors, which were affectionate and appropriate. When Brother assumed supervision of the visits in October 2021, visits became inconsistent. In December video visits, Father was at Mother's house and told Minors that he and Mother were talking again and trying to "figure things out." The Agency proposed a revised case plan for Father, eliminating the objective that he ensure Minors' school attendance, and adding the objective that he have weekly virtual visits with Minors.

At a contested hearing on March 8, 2022, the court found that reasonable services had been offered or provided, that out-of-home placement continued to be necessary and appropriate for Minors' safety, and that Father had made minimal progress in alleviating or mitigating the causes necessitating placement. The court terminated Mother's reunification services, continued Father's, and ordered father to cooperate with the social

worker and participate in all aspects of the case plan.  A 12-month permanency hearing was scheduled for July 13, 2022.

D.    *12-Month Review – March through August 2022*

In a status report filed on July 13, 2022, the Agency recommended terminating reunification services for Father and asked the court to set a section 366.26 hearing.  Father had reported to the Agency that he was temporarily disabled and unable to obtain employment, and had primarily been supported during the period by disability benefits.  He had moved from Alameda County to Santa Clara County and was seeking housing through resources there.

The Agency reported that during the reporting period, Father primarily visited Minors by video call, and there were no concerns about his interactions with them.  The Agency proposed an updated case plan for Father with two service objectives, for use if the court declined to terminate services.  The first objective, to maintain the relationship between him and Minors, included Father participating in phone calls with Minors twice a week, attending scheduled video visits at least every two weeks, and participating in monthly in-person visits.  The second, to stay free from illegal drugs, included Father completing a substance evaluation with an approved provider and following the provider's recommendations.[3]

---

[3] Apparently, Father had reported using marijuana to manage pain. The portion of the Agency's report describing, "What We Are Worried About," stated that the Agency "would like [Father] to comply with a Drug and Alcohol assessment to further determine his need for support if warranted. The [Agency] remains worried about the history of domestic violence."  The updated case plan for Father addressed drug and alcohol use, but not domestic violence.

At a contested hearing on August 29, 2022, the court found that the Agency had provided reasonable services and that Father had made partial progress toward alleviating or mitigating the causes necessitating out-of-home placement. The court ordered continued reunification services for Father, authorized unsupervised phone calls and video visits between Father and Minors at least once a week, and gave the Agency discretion for unsupervised in-person visitation after a hair follicle test was completed. An 18-month permanency hearing was scheduled for November 21, 2022.

E.    *18-Month Review – September 2022 through January 2023*

1.    *Agency Report and Addendum*

On November 18, 2022, the Agency filed a status review report recommending that Minors remain in out-of-home care, and requesting a continuance to allow Minors to participate in transition visits to assess Father's capacity to be a full-time parent. Father had been maintaining contact with the Agency and had obtained stable employment and housing in Santa Clara County. Father's hair follicle test was negative for all substances other than marijuana; Father reported he was decreasing his use of marijuana for pain management; and it was determined that Father did not require drug treatment services.

Father and Minors had participated in video visits and in-person supervised visits. No concerns were reported. Minors seemed comfortable in Father's care during in-person visits, and an unsupervised in-person visit was scheduled for late November. If that visit was successful, Minors would travel to northern California for a three-day visit with Father.

The court continued the hearing and set a contested hearing for January 11, 2023.

10

Then, in an addendum report filed on January 10, 2023, the Agency recommended that Minors remain in out-of-home placement, with termination of reunification services to Father, and asked the court to set a section 366.26 hearing to establish legal guardianship with Brother.

The Agency reported that in November and December 2022, Father had unsupervised visits with Minors in southern California, both of which reportedly went well. But in early January 2023, when the social worker visited Father at his home, the social worker noticed burn marks on Father's face. Father reported that on December 30, a teapot had malfunctioned and blown up in his face, and that he had received medical care and was released from the hospital the same day.[4] A few days after the home visit, the social worker learned from Brother that Minor J.R. had received a call from Father's now ex-girlfriend, A., who told J.R. that she had been involved in a domestic violence incident with Father on December 30, in which Father was intoxicated and A. threw hot water on Father's face.

The social worker then spoke with Father, who admitted he had not been truthful in his prior discussion with her, and that A. had in fact thrown boiling water on him. Father denied any hitting, shoving, or pushing. He said that after several attempts to have A. leave the home, he " 'placed his hand on her shoulder forcefully' " and asked her to leave. The police were called. Father also stated that he had a criminal protective order against A., which had been initiated in May 2022.

The Agency concluded that although Father had made some progress toward mitigating the cause for out of home placement, Father needed to "demonstrate an ability to continue to be self-sufficient and maintain

---

[4] Father testified that the "teapot" was an electric kettle.

11

unsupervised visitation with his children in order to further determine his ability to parent fulltime. [Father] needs to enroll in therapy services to address his trauma and involvement in domestic violence incidents."

2. *January 11, 2023 Hearing*

At the January 11, 2023 contested hearing, the Agency submitted on the reports. Minors' counsel reported that Minor J.R. wanted to be placed with Father, but the other three Minors expressed interest in living with Father, or with Mother (who had been in touch with them over the holidays), and also ranked living with Brother "very highly."

All counsel stipulated that Father's visits with Minors had gone well.

Father's counsel called Father to testify. Father stated that on the day of the incident with the boiling water, A. had approached him while he was taking garbage out of his house. He knew there was a protective order in place against her, and initially he just ignored her, but then she yelled that she was pregnant. Father agreed to go to a public place with her to talk, and they went to a big box store in A.'s car. In the store, A. yelled at Father, and eventually he drove them back to his house in A.'s car and told her they could talk another time. Father went into his home and started boiling water for tea. About five or 10 minutes after he entered the home, A. came in through the front door, which was unlocked. A. started yelling at him. He asked her to leave, and when she refused, he called the police, but did not tell them that there was a protective order in place until they arrived. Before the police arrived, A. continued screaming and Father kept asking A. to leave. At some point, A. made a comment about his children, and he put his hand on her shoulder and said she needed to leave. A. pushed his hand away, grabbed the pot, threw it at his face, and then walked out. Father locked the door behind her. He called the police two more times, and they arrived after about an

12

hour and a quarter. A. waited outside until the police came, and Father was inside, pacing and talking to the police dispatcher. Father informed the court that the police were investigating the incident, and there were not yet criminal charges. He also informed the court that the protective order against A. had been issued in May 2022 because A. hit him with her fist while he was asleep, and that there were criminal charges as to that assault.

When the court asked Father why he told the social worker that a pot blew up in his face, Father initially responded, "because it wasn't that far from the truth." He later admitted that when the social worker asked him about the injuries to his face he did not tell her what really happened, and that he did not tell her the truth out of fear, because he wanted his children home and knew that "it's been an issue in the past with this woman. It's been mentioned by [Brother] specifically about this woman. I understand there's some like s[k]epticism there, and they're worried about this woman, as I am too." In short, he was afraid that he wouldn't get his children back because there had been a domestic violence incident. He testified that the incident occurred because he let his guard down because A. said she was pregnant, "[a]nd for any of my children I would stop and see about that."

Father testified that he had prepared to have Minors with him by decorating his home, finding schools within walking distance of the home, and arranging with his two sisters for childcare when he was at work.

Father testified he had been together with A. for three years and that based on what Minors had told him, they had no issues with her at all. He admitted he would not be surprised if Minors had told the Agency that they were fearful of A., or at least fearful for his safety, and that Minors had seen him be abused by A. and by Mother. Minor's counsel asked Father if he intended to be a father to A.'s baby. He responded, "If she is pregnant, yeah.

13

From a distance, of course." He had not had any conversations with A. since the incident with the boiling water and had no plans to speak with her.

The court continued the matter to January 24, 2023 for argument and decision.

### 3 *January 24, 2023 Hearing*

At the January 24, 2023 hearing, the Agency's attorney stated that the Agency had hoped to recommend family maintenance with Father, but Father's testimony made clear that he is "involved in a domestic physically violent relationship," and Minors would be at substantial risk of harm if they were returned to him. Therefore, the Agency was asking the court to terminate services.

Minors' counsel asked the court to continue services to the 24-month date, and argued that since the Agency's "initial goal was to return [Minors] today, . . . the next logical goal . . . would be to extend services." Minor's counsel argued that there was clear and convincing evidence that it was in Minors' best interest to continue services to Father, because he had made "quite a lot of progress since he began participating in services in earnest," including setting up a home, having employment, and demonstrating sobriety, and there was a substantial probability that Minors could return to Father after the extended services period. Minors' counsel argued that although there were concerns about A., more information would be available in a few months, including whether Father and A. had separated, and, if they were going to have a child together, whether they had a coparenting plan that did not involve risk to him or Minors.

Father's counsel asked the court to return Minors immediately or extend services. He argued that Father was a victim of domestic violence, and urged the court to consider that Father's priority was for Minors to

14

return to him and that Father's dishonesty with the Agency about the recent incident with A. arose from his fear that they would not come home. Father had fulfilled his case plan, arranged for schools and childcare, and maintained his relationship with Minors through visitation, which had consistently gone well.

The court stated that the case was already at the 20-month point, and disagreed that there was a substantial probability of Minors returning to Father after four more months. The court noted that Father had not been honest with the Agency about how his face was burned, and expressed concerns about the credibility of his testimony, including "how done [he] is with [A.]" and his testimony that on the day Father was burned, A. "just walked in the house" through an unlocked door. The court also expressed doubts that much more information would be available at the end of the extended period, which would be in four months: "I don't know if dad will be asking for a DNA test from [A.]. And I don't know how pregnant she is, or if that baby will be here at that point, or how they will figure out how to co-parent, or if the father changes his mind and doesn't go forward in the criminal case. I probably won't know any of that." The court agreed that father was a victim of domestic violence, but expressed concerns about his behavior and his response to the violence. The court declined to continue services, stating, "I don't see a bas[i]s to continue services for four months based upon the father's behavior in this incident, the domestic violence with [A.] I don't know that that's in the best interest of the children."

The court stated that perhaps therapy or domestic violence services should have been part of Father's case plan, but no one ever objected to his case plan or asked that those services be added to it. The court added that reasonable services were not the issue before it; the issue was whether there

15

was a substantial risk for Minors, and based on Father's testimony, there was substantial risk.

The court found by clear and convincing evidence that reasonable services had been offered and provided. The court found that returning Minors to Father would create a substantial risk of detriment, based on the facts that although Father had participated in his case plan and made partial progress, he had not alleviated or mitigated the causes necessitating out-of-home placement.

The court terminated reunification services to Father and set a section 366.26 hearing. Father timely filed a writ petition.

## DISCUSSION

A. *Applicable Law and Standard of Review*

As a general matter, the court is required to order family reunification services when a child is removed from the parent's custody at a disposition hearing. (§ 361.5, subd. (a).) "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible' . . . [by enabling parents] to demonstrate parental fitness and so regain custody of their dependent children." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) Reunification services are among the "[s]ignificant safeguards [that] have been built into the current dependency scheme." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307-308.) "The juvenile court cannot terminate parental rights if a parent *never* receives reasonable services." (*Michael G. v. Superior Court* (Apr. 6, 2023, No. S271809) ___ Cal.5th ___, ___ [2023 WL 2801499 at p. *12] (*Michael G.*), citing § 366.26 and *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016 (*Mark N.*).)

Reunification services are generally available to parents for a maximum of 18 months from the removal of their children from their home

16

(§ 361.5, subd. (a)(3)(A).) At an 18-month review hearing, the juvenile court must "determine by clear and convincing evidence whether reasonable services have been offered or provided to the parent." (§ 366.22, subd. (a)(3).) "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . .' [Citation.] Reunification services should be tailored to the particular needs of the family. [Citation.] [¶] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.] The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' " (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001 (*A.G.*).)

"Though a court at the 18-month review hearing must determine whether reasonable services have been offered or provided to the parent, an affirmative answer is not a statutory prerequisite to setting the permanency planning hearing."[5] (*Michael G., supra,* ___ Cal.5th at p. ___ [2023 WL 2801499 at p. *7], citing § 366.22, subd. (a)(3).) If reasonable services have

---

[5] In *Michael G.*, which was decided after briefing in this matter was completed, our Supreme Court addressed the uncertainty expressed by some appellate courts as to the proper course of action when the juvenile court determines at an 18-month hearing that reasonable services were not provided during the 12- to 18-month period. (*Michael G., supra,* ___ Cal.5th at p. ___ [2023 WL 2801499 at p. * 3].) *Michael G.* clarified that in such cases a parent "may seek an extension of services beyond 18 months, but such extensions are not automatic." (*Id.* at p. ___ [2023 WL 2801499 at p. *1].)

17

not been ordered, the court may continue the permanency planning hearing and extend reunification services "provided that a continuance shall not be granted that is contrary to the interest of the minor" (§ 352, subd. (a)(1)) and "upon a showing of good cause." (*Id.* subd. (a)(2)); *Michael G., supra,* ___ Cal.5th at p. ___ [2023 WL 2801499 at p. *10] [authority to continue the permanency planning hearing implies power to continue reunification efforts].) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to minor of prolonged temporary placements." (§ 352, subd. (a)(2).) "Good cause" may exist in extraordinary circumstances, including where the child welfare agency has offered " ' "inadequate services." ' " (*Michael G., supra,* ___ Cal.5th at p. ___ [2023 WL 2801499 at p. *9].)

We review the juvenile court's finding that reasonable services were provided for substantial evidence. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238 (*T.J.*), disapproved on another point in *Michael G., supra,* ___ Cal.5th at p. ___, fn. 8 [2023 WL 2801499 at *8, fn. 8.].) Because the juvenile court must make its finding by clear and convincing evidence, the question we face "is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.) "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' " (*Id.* at p. 1006.) We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may

18

have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

## B.    *Forfeiture*

Because Father never objected to the contents of his case plan in the trial court, and did not appeal from the dispositional order or its modifications after the six-month and 12-month hearings, the Agency argues he has forfeited his right to challenge the adequacy of the services he was offered.  We disagree.

Although "[a]n appellate court generally will not consider a challenge to a trial court's ruling if the aggrieved party could have, but did not, timely object in the trial court when its purported error could easily have been corrected[,] . . . '[a]pplication of the forfeiture rule is not automatic.' " (*In re M.S.* (2019) 41 Cal.App.5th 568, 588, disapproved on another point in *Michael G., supra*, ___ Cal.5th at p. ___, fn. 8 [2023 WL at *8, fn. 8].)

In any event, the forfeiture rule does not apply here, because the contention that a judgment is not supported by substantial evidence is an exception to the rule of forfeiture.  (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464.)  It is the Agency's burden to establish that it provided Father reasonable services designed to assist him in overcoming the problems that led to the dependency proceeding.  (*In re Chantal S.* (1996) 13 Cal.4th 196, 210 ["the social services agency has the burden of presenting evidence to support its allegations and requested orders"].)  And in challenging the merits of an order, "a parent is not required to object to the agency's failure to carry its burden of proof." (*Javier G., supra*, 137 Cal.App.4th at p. 464.)  Accordingly, Father's claim that there was insufficient evidence to support the juvenile court's finding that the Agency provided him with reasonable services is not forfeited by his failure to argue the issue below.  (*Ibid.*; see

*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1157-1158 [parent does not forfeit challenge to agency's failure to meet it statutory obligation to provide adequate reunification services by failing to object in the juvenile court].)

C.    *Reunification Services*

We find merit in Father's argument that the juvenile court's finding of reasonable services is not supported by substantial evidence.

This dependency proceeding was precipitated by a January 2021 incident of domestic violence by Mother, which occurred after Father violated a domestic violence restraining order against him. Further, in July 2021 Father reported to the Agency that he experienced PTSD from being stabbed several times, and in August 2021, after a reported incident of domestic violence involving Father, A., and Mother, Father reported that his symptoms had returned. Descriptions of alleged incidents of domestic violence by Mother, Father, and A., and concerns about domestic violence pervade the reports that the Agency filed from the beginning of the proceeding through the January 2023 addendum report. Thus, domestic violence issues were at the forefront of this case from the beginning through the 18-month review hearing. Yet it was not until the January 2023 addendum report, when the Agency recommended terminating Father's services, that the Agency determined that Father required therapy services to address his trauma and involvement in domestic violence.

The Agency correctly points out that it referred Father to a domestic violence service provider. But that referral counts for little here. The Agency reported in May 2021 that on May 17, Father requested a referral to parenting and domestic violence classes. The only subsequent reference to a domestic violence program is the Agency's report in August 2021 that in July

20

2021 it sent an email to Peace Creations to follow up on Father's progress, and was informed that Father had not completed the registration paperwork. Nothing in the record shows that the Agency addressed Father's apparent failure to register for Peace Creations in any of its subsequent contacts with him over a period of about 18 months. The referral to Peace Creations, which was not required by the case plan, was laudable, but the record simply does not show that the Agency made reasonable efforts to assist Father in areas where his "compliance" with provided services arguably "proved difficult." (*A.G.*, *supra*, 12 Cal.App.5th at p. 1001.)

The case plans that were proposed and adopted for Father addressed the Agency's concerns about Minors' attending school, concerns about maintaining contact between Father and Minors through visitation, and concerns about Father's use of marijuana, but contained nothing to address the Agency's repeated concerns about domestic violence. The juvenile court remarked upon this at the 18-month review hearing, where it observed that there were "a lot of issues" about domestic violence in the proceeding, that perhaps Father "should have been doing some kind of therapy," and that perhaps domestic violence "should have been a part of the case plan."

Because a case plan must be " ' "specifically tailored to fit the circumstances of each family" ' " and " ' "designed to eliminate those conditions which led to the juvenile court's jurisdictional finding" ' " (*In re K.C.* (2012) 212 Cal.App.4th 323, 329), on the record here, we fail to see how the Agency's provision of services to Father could be found reasonable by clear and convincing evidence.

D.     *Remedy*

Relying on section 352 and cases holding that the juvenile court has discretion to extend services beyond 18 months when it finds that reasonable

services have not been provided (*In re J.E.* (2016) 3 Cal.App.5th 557, 564-565; *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1420, 1428 (*Tracy J.*); *Mark N., supra,* 60 Cal.App.4th at p. 1017), Father argues that we should direct the juvenile court to extend the reunification period and order continued services. We agree.

The Agency argues that even if we conclude the juvenile court erred in finding that reasonable services had been provided, we should affirm the termination of services and setting of the section 366.26 hearing. The Agency relies primarily on the language in section 352 that authorizes the continuation of a hearing beyond the ordinary time limit "provided that a continuance shall not be granted that is contrary to the interest of the minor" (§ 352, subd. (a)(1)), and the juvenile court's statement that based on Father's behavior in the boiling-water incident with A., "I don't know that [continuing services] is in the best interest of the children."

We do not find the Agency's argument persuasive, because the juvenile court's determination that continuing services was not in Minors' best interests rested on an incident of domestic violence committed against Father and Father's response to it—the type of incident and response that would have been addressed by reasonable services, had they been provided. Thus, the juvenile court's best interest determination was affected by the Agency's failure to provide reasonable services to Father. In case like this one, where reasonable services have not been provided, such a determination is suspect and leads to due process concerns. "When appropriate services designed to mitigate risk to the child have not been provided to a parent, it is likely risk to the child will not have been mitigated. Thus, where reasonable services have not been provided or offered to a parent, there is a substantial likelihood the juvenile court's finding the parent is not likely capable of safely resuming

22

custody of his or her child may be erroneous. [Citation.] Providing reasonable services is one of 'the precise and demanding substantive and procedural requirements . . . carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents.' (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256.) Therefore, 'to meet due process requirements at the termination stage, the court must be satisfied reasonable services have been ordered during the reunification stage.' [Citations.]" (*In re M.F.* (2019) 32 Cal.App.5th 1, 18-19, disapproved on another point in *Michael G., supra*, ___ Cal.5th at p. ___, fn. 8 [2023 WL at *8, fn. 8].)

In determining the appropriate remedy here, we find it instructive to consider *T.J., supra*, 21 Cal.App.5th 1229, where the juvenile court held the 12-month review hearing 15 months after a mother's children were detained from her, found that reasonable services had been provided, and set a section 366.26 hearing. (*Id.* at pp. 1236-1237.) In *T.J.*, our colleagues in Division Four concluded that the juvenile court erred in finding reasonable services, and further concluded that even though it was reaching its decision more than 18 months after the children were detained, it was empowered to direct that an extended period of services be provided on remand. (*Id.*at p. 1251; see also *Tracy J., supra*, 202 Cal.App.4th at pp. 1420, 1428 [granting a period of additional reunification services to parents where services were improperly terminated at a combined 12- and 18-month hearing based on unsupported finding that reasonable services had been provided].) [6]

---

[6] *T.J.* and *Tracy J.* differ from the case before us in that the parents in those cases were intellectually or developmentally disabled. (*T.J., supra*, 21 Cal.App.5th at p. 1232; *Tracy J., supra*, 202 Cal.App.4th at p. 1419.) Although "courts are more willing to extend services beyond 18 months"

23

The juvenile courts in *T.J.* and *Tracy J.* were directed to order the provision of additional reunification services (*T.J.*, *supra*, 21 Cal.App.5th at p. 1257; *Tracy J.*, *supra*, 202 Cal.App.4th at p. 1428), and the juvenile court here shall be similarly instructed.[7]  It was error to deny Father's request for continued services at the 18-month review hearing where there was not substantial evidence to support a finding that reasonable services had been offered or provided, and where the juvenile court's denial rested on a best interest determination that was based on an incident similar to the one that led to the dependency, and which should have been the subject of reasonable services.  We conclude that the Agency must offer further services to Father before the juvenile court schedules a hearing under section 366.26.

## DISPOSITION

The petition is granted.  Let a peremptory writ of mandate issue directing the juvenile court to vacate its orders terminating Father's reunification services and setting a hearing under section 366.26.  The juvenile court is further directed to set a continued hearing under section 366.22 at the earliest convenient time and order the Agency to provide Father with an additional period of reunification services consistent with the views

---

when the parent has special needs (*T.J.*, *supra*, 21 Cal.App.5th at p. 1257), we find the cases persuasive, even in the absence of any indication that Father here has a similar disability.

[7] In *Michael G.*, *supra*, our Supreme Court disapproved *T.J.* to the extent its reasoning reflected a misreading of subdivision (a)(4)(A) of section 361.5.  (*Michael G.*, *supra*, ___ Cal.5th at p. ___, fn. 8 [2023 WL 2801499 at *8, fn. 8].)  The Supreme Court explained, however, that the misreading did not call into question the ultimate holding of *T.J.*, which concerned the remedy available to a parent who, like Father here, "was never offered or provided reasonable reunification services at any point during the first 18 months after the [children were] removed from parental custody."  (*Ibid.*)

expressed in this opinion. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.450(a), 8.490(b)(2)(A).)

_____

Miller, J.

WE CONCUR:

_____

Stewart, P.J.

_____

Richman, J.

A167039, *J.R. v. Superior Court*